## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

Jane Doe,

          Plaintiff,

  v.

Loyola University Maryland,

          Defendant.

| |
|---|
| **Jury Trial Demand** |
| **VERIFIED COMPLAINT** |
| **Case No.:** |

Plaintiff Jane Doe[1] ("Plaintiff") as and for her Complaint against Loyola University Maryland ("Loyola" or "Defendant") respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.    Jane Doe seeks damages and injunctive relief based on the Defendant's gender-based motivation, bias and unlawful practices in investigating charges against, conducting a hearing and appeal and imposing discipline on the Plaintiff.  Jane Doe was the subject of a disciplinary investigation (the "Investigation") and hearing (the "Hearing") at Loyola that was initiated in January 2019.  After a party in Jane Doe's room, John Doe, who was 5" 8" tall, and Jane Doe, who was 4" 11" tall, were kissing and discussed having sex.  John Doe then without Jane Doe's consent forcefully

---

[1] Both Jane Doe and John Doe are named in this document pseudonymously in order to maintain their anonymity.  Additionally, student-witnesses are only referred to by their first names in order to maintain the anonymity of Jane Doe and John Doe.

1

digitally penetrated her vagina multiple times, pinned her underneath him with his arms causing bruising, choked her while he penetrated her vagina thrusting forcefully with his penis, made vulgar verbal sexual slurs to her, told her to scratch him, and then ejaculated, all resulting in lacerations, bruises and injuries to Jane Doe that required medical attention and months of physical therapy.  John Doe dressed himself, did not speak with Jane Doe and left the room.    Hours later, John Doe filed a false and preemptive formal complaint with the Loyola Title IX office claiming that Jane Doe had sexually assaulted him. John Doe claimed that he was incapacitated due to alcohol and could not consent to sex to preempt any charge by her of sexual assault by him. Jane Doe then filed her own complaint of sexual assault against John Doe.   Loyola's investigation of the charges and hearing process were deeply flawed, and Jane Doe was denied the most rudimentary elements of fairness and procedural regularity promised to her by Loyola in its Policies and required by Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, *et seq*. ("Title IX").  On May 19, 2019, a panel of Loyola employees found Jane Doe responsible for sexual assault and suspended her from school, and a panel of Loyola employees later denied Jane Doe's appeal.  Jane Doe has sustained substantial damages as a result of the Defendant's actions with respect to its handling and disposition of the charges asserted against her.

## **THE PARTIES**

2.     Plaintiff, Jane Doe, resides in the State of Virginia.  Jane Doe was a full-time student at Loyola University Maryland in Spring 2019.

3.      Defendant, Loyola University Maryland, is a private, liberal arts college and a domestic non-profit corporation domiciled in Maryland, with its principal place of business located at 4501 N. Charles Street, Baltimore, MD 21210.

## JURISDICTION AND VENUE

4.      This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: Plaintiff states claims arising under the laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88; and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

5.      Plaintiff also invokes this Court's jurisdiction pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6.      This Court has personal jurisdiction over Defendant on the grounds that it is conducting business within the State of Maryland.

7.      Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Defendant is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## GENERAL ALLEGATIONS

### General Requirements of Title IX

8.      Title IX is a comprehensive federal law that prohibits any federally-funded education program or activity, such as QU, from discriminating on the basis of sex. Title

IX protects students from all forms of sex discrimination, including sexual harassment and gender discrimination.

9.      In 1975, the Department of Health, Education and Welfare, the predecessor to the United States Department of Education ("DOE"), adopted regulations interpreting Title IX. These regulations (the "Regulations") are codified at 34 C.F.R. Part 106. The DOE's Office for Civil Rights ("OCR") enforces Title IX.

10.     34 C.F.R. § 106.31(b) provides that an educational institution:

> shall not on the basis of sex, (1) treat one person differently from another in determining whether any such person satisfies any requirement or condition for the provision of such aid, benefit or service; (2) provide different aid, benefits or service or provide aid, benefits or service in a different manner; (3) deny any person any such aid, benefits or service; (4) subject any person to separate or different rules of behavior, sanctions, or other treatment.

11.     The OCR publishes updates and guidance to schools to assist in interpreting and complying with Title IX, including through its Title IX Resource Guides, its "Dear Colleague" letter, and its Question and Answers on Title IX, including on Sexual Harassment and Sexual Violence ("OCR Publications"). The operative OCR Publications require adherence to the following procedures to achieve compliance with Title IX in the following pertinent parts:

> a.      A school must adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct. OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the school (i) provides notice of the school's grievance procedures, including how to file a complaint, to students, parents of elementary and secondary school students, and employees; (ii) applies the grievance procedures to complaints filed by students or on

their behalf alleging sexual misconduct carried out by employees, other students, or third parties; (iii) ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; (iv) designates and follows a reasonably prompt time frame for major stages of the complaint process; (v) notifies the parties of the outcome of the complaint; and (vi) provides assurance that the school will take steps to prevent recurrence of sexual misconduct and to remedy its discriminatory effects, as appropriate.

b.      In every investigation conducted under the school's grievance procedures, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred.

c.      A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school. Schools should ensure that institutional interests do not interfere with the impartiality of the investigation.

d.      An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case.

e.      Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms.

f.      Restricting the ability of either party to discuss the investigation (e.g., through "gag orders") is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable. Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially.

g.      The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.

h.      The investigator(s), or separate decision-maker(s), with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of the school's sexual misconduct policy.

i.      Any process made available to one party in the adjudication procedure should be made equally available to the other party.

j.      Schools are cautioned to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication. Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially.

k.      Disciplinary sanction decisions must be made for the purpose of deciding how best to enforce the school's code of student conduct while considering the impact of separating a student from her or his education. Any disciplinary decision must be made as a proportionate response to the violation.

l.      postsecondary institutions must provide simultaneous written notification to both parties of the results of the disciplinary proceeding along with notification of the institution's procedures to appeal the result if such procedures are available, and any changes to the result when it becomes final. This notification must include any initial, interim, or final decision by the institution; any sanctions imposed by the institution; and the rationale for the result and the sanctions.

m.      the school must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation. The specific steps in an investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors. However, in all cases the inquiry must be prompt, thorough, and impartial.

n.      the school must adopt and publish grievance procedures providing for the prompt and equitable resolution of complaints of discrimination on the basis of sex.

o.      the school must not only "ensure the Title IX rights of the complainant," but must do so while "according due process to both parties involved." This Title IX "due process" requirement applies to both state and private colleges and universities that are in receipt of federal funds.

p.    The "prompt and equitable" procedures that a school is required to implement to "accord due process to both parties involved" must include, at a minimum: "Notice . . . of the procedure, including where complaints may be filed"; "Application of the procedure to complaints alleging [sexual] harassment . . ."; "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence"; "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and "Notice to the parties of the outcome of the complaint . . . ."

q.    the school must make sure that all designated employees have adequate training as to what conduct constitutes sexual harassment and are able to explain how the grievance procedure operates.

r.    There is a requirement that the trained investigator "analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case. (emphasis added).

s.    The burden is on the institution, and not on either party, to gather sufficient evidence to reach a fair and impartial determination as to whether sexual misconduct has occurred and

t.    Removing the 60-day deadline for adjudication of claims in favor of a prompt resolution of claims that afforded both parties fairness.

**Loyola's Contractual Obligations Under its Publications**

12.    Defendant sets forth its policies regarding fairness, compliance with federal and state laws, student conduct violations and its processes for student conduct violations and sexual misconduct, including sexual assault in many publications, including its 2018-2019 "Sexual and Gender Based Misconduct" policy ("Title IX Policy") and its "Community Standards 2018-19" ("Handbook"). The Title IX Policy, the Handbook, and other related written documents (the Loyola "Publications") set forth Loyola's policy to comply with Title IX and its grievance procedures for student

conduct and sexual misconduct, including the following in relevant part:

      (a)    "consent" is defined as an affirmative indication by words and/or actions of a voluntary agreement to engage in the particular sexual act or conduct in question. Consent for one sexual act or conduct does not constitute consent to all sexual acts or conduct. Consent can be withdrawn at any time, and once withdrawal of consent has been expressed, sexual activity must cease.  Consent cannot be obtained through the use of force, threat, intimidation, or coercion.  Consent cannot be given by someone who is not able to effectively communicate or to understand the nature of the conduct being engaged in as a result of incapacitation due to consuming drugs or alcohol or for any other reason (including but not limited to being unconscious, asleep, or otherwise unaware that sexual activity is occurring). Incapacitation may also exist because of a physical, mental or developmental disability.  Silence or absence of resistance on the part of an individual does not constitute their consent.

      (b)    Sexual harassment is defined as unwelcome sexual advances, requests, and other verbal or physical conduct of a sexual nature . . .  which is sufficiently severe, pervasive, and objectively offensive as to have the purpose or effect of unreasonably interfering with an individual's performance or creating an intimidating, hostile, or offensive educational . . .  environment.

      (c)    Sexual verbal abuse is using language that is sexual in nature and unwanted on the part of another person.  Examples include but are not limited to phone calls or use of written and/or verbal communication that are intimidating, threatening, or obscene in nature.

      (d)    Sexual assault includes any sexual act or sexual contact without consent, including intercourse; oral sex; unwanted touching of an intimate body part of another person, such as sexual organs, buttocks, or breasts; or an attempt of any of the above.  Rape is a type of sexual assault.  This description of prohibited sexual acts and conduct is not intended to be inclusive of all conduct that could fall within this category.  It is the intent of this policy to provide notice that any unconsented sexual conduct, whether by a stranger or an acquaintance of the victim, is prohibited.

      (e)    The University's procedures provide for prompt, fair, equitable, and impartial investigation and resolution of all reports of sexual misconduct. Investigations and hearings will be conducted by officials who have received annual training on the issues related to domestic violence, dating violence, sexual assault, and stalking and on how to conduct an investigation and hearing process that protects the safety of participants and promotes accountability.  . . .  Reports of

sexual assault, dating violence, domestic violence, and stalking will not be resolved through mediation.

(f)    As described in this section, students who report sexual misconduct, or participate in an investigation as witnesses, will not be subject to disciplinary action for their own personal involvement with alcohol and/or other drugs at or near the time of the incident, unless the involvement was reasonably likely to place the health or safety of another individual at risk. The University may initiate an educational discussion or pursue other educational remedies regarding the alcohol and/or other drugs.

(g)    Students are encouraged to seek medical assistance in cases of sexual assault.

(h)    All participants will be treated with dignity, respect, and sensitivity. The complainant and respondent will be notified of the date, time and location of each hearing, meeting, or interview that the student is required or permitted to attend and shall have the right to be accompanied by an advisor of choice. The time frame for conducting the investigation is usually 60 University business days. The time frames for the hearing panel proceedings and any appeal(s) are set forth below. Each of these deadlines may be extended for good cause. The University will notify the parties when a delay is anticipated.

(i)    The Title IX Deputy for Students will provide the respondent with timely written notice of the reported violation, including the date, time and location of the alleged violation, the type of sexual misconduct alleged, the conduct allegedly constituting the violation, and the range of potential sanctions associated with the alleged violation. The Title IX Deputy for Students (or their designee) will designate an investigator and coordinate the logistics of the investigation process. The complainant and respondent shall have the right to submit to the investigator evidence, witness lists, and suggested questions for witnesses. At the conclusion of the investigation, the investigator shall prepare a written report summarizing and analyzing the evidence. The complainant and respondent will receive the investigative report and may submit a written response to the Title IX Deputy for Students (or their designee) within five University business days. The Title IX Deputy for Students (or their designee) will provide the written response to the Office of Student Conduct to be included in the materials reviewed by the hearing panel. Each party's written response, if any, will be shared with the other party. Based on the investigation and the parties' responses, if any, the Office of Student Conduct may schedule a sexual misconduct hearing panel, usually within 15 University business (sic) following receipt of the investigative report and parties'

responses from the Title IX Deputy for Students (or their designee).

(j)     All hearings, also known as proceedings, involving sexual misconduct will be conducted in accordance with the normal rules and procedures of the student conduct process with special sensitivity to the nature of the charges and the best interests of all parties involved.  All participants are expected to maintain confidentiality regarding the proceedings, except that the complainant and the respondent may not be required to maintain confidentiality as to the outcome of the proceedings and any directives regarding confidentiality shall not impede the parties' ability to obtain and present evidence or otherwise support or defend their interests.  In recognition of the unique nature of sexual misconduct cases, the procedures specified in this section supersede any conflicting provisions of the University student conduct process.

(k)     The sexual misconduct hearing panel will be comprised of one faculty member, one administrator, and the Director of Student Conduct (or their designee).  All panel members will receive special training on sexual misconduct cases.

(l)     The respondent and complainant may each have an advisor present throughout the entire process, including the hearing.  The advisor is not allowed to address the investigators, address the hearing panel, or question witnesses.  The advisor cannot serve as a witness.  Both the complainant and the respondent can have an advisor of choice, which can include parents, attorneys, or others who are not fulltime members of the University community.  Disruptive advisors will be removed from the process, and the process will continue.  Students are required to notify the Office of Student Conduct one University business day in advance of the hearing date if a student plans to bring an advisor.  Advisors can request an outline of their role and expectations for their participation in the student conduct process.

(m)     Under Title IX, both the respondent and complainant have a right to similar and timely access to information that will be used at the hearing.  The hearing materials, or instructions for how to view certain materials, normally will be distributed to the parties and the members of the hearing panel five University business days prior to the hearing.

(n)     The respondent and the complainant each have the right to bring fact witnesses to the hearing to testify on their behalf.  There is no limitation placed on the number of fact witnesses; however, students are required to notify the hearing officer of the names of witnesses attending the hearing at least one University business day in advance of the hearing.  In the event that a fact witness cannot attend a hearing, the fact witness may email or personally deliver a signed written

10

statement directly to the hearing officer in advance of the scheduled hearing. Students also may submit up to two character witness statements in writing to the Office of Student Conduct at least one University business day prior to the hearing.

(o)     The hearing will begin with the panel chair going over the student rights and responsibilities for the respondent, and then reading the charges.  The respondent will have the opportunity to present a brief statement to the panel and respond to questions from the panel.  The complainant will then have an opportunity to present a brief statement to the panel and respond to questions from the panel. Either party may choose to present their testimony outside of the presence of the other party, but the non-testifying party will be able to listen to the testimony remotely.  The parties have the right to listen to all testimony given during the hearing, if they so choose.  The panel will then call witnesses and has the ability to recall the parties and any witness for clarification.  The complainant has the right to provide a written impact statement that describes how the incident has affected them.  The impact statement is reviewed by the hearing panel only if a determination of responsibility is made and before a sanction is determined.  If an impact statement was submitted and reviewed by the hearing panel, a copy will be provided to the respondent with the decision letter.

(p)     The panel will make findings of fact and determinations using a preponderance of evidence standard.  If the panel determines that the respondent is responsible for a violation of this policy, the panel will decide the appropriate sanctions in accordance with the Student Code of Conduct.  Drug or alcohol use by the respondent is not a defense to a charge of sexual misconduct and will not be considered a mitigating factor in assessing an appropriate sanction.  Violations of the sexual misconduct policy are serious and the range of sanctions includes the following: written reprimand, fine, restitution, educational project, alcohol and drug screening/education/treatment, civility hours, parental notification, restricted access or privileges, senior week restrictions, loss of room selection privileges, relocation to another residence, restricted contact, social restrictions, residence hall probation, disciplinary probation, deferred suspension from the residence halls, deferred suspension from the University, suspension from the residence halls, suspension from the University, expulsion, student development assessment and evaluation, periodic drug testing, postponement of activity participation and conferring of honors and degrees, mentoring with an administrator, Jesuit reflection, and continuation/modification or (sic) interim measures.

(q)     The respondent and the complainant will be informed concurrently in writing of the outcome of the hearing, also known as the result, normally within ten (10) University business days.  Both parties will receive written notice of any sanctions imposed on the respondent, except that in cases of non-violent sexual

harassment the complainant will only receive notice of any sanctions that relate directly to the complainant.  The result must also include the rationale for the result and the sanctions.

(r)     The complainant and the respondent each have the right to appeal the hearing panel's decision and/or the sanction to the University Board on Discipline.  In cases where appeals are submitted by both parties, both appeals will be considered together by the same board.  If only one party appeals, the other party has the right to attend the hearing and participate.  Unless indicated otherwise in the original decision letter, the type written appeal should be submitted via email or in person to the Dean of Students in Jenkins Hall 105.  The appeal must be submitted within five University business days of receipt of the decision letter of the hearing panel. If a party does not appeal the hearing panel's decision within this time period, they have waived a right to appeal.  An appeal must be based upon one or more of the following grounds:

- The party alleges that their rights to a fair hearing were violated.

- The party alleges that new evidence that was not available for the original hearing might impact the decision of responsibility or determination of sanction.

- The party alleges that the sanctions imposed are grossly disproportionate to the findings of responsibility.

q.     The burden is on the student to provide support in the appeal letter for the asserted grounds.  The Dean of Students (or their designee) shall determine whether the student has provided sufficient support for each asserted ground. Failure to follow the guidelines or to provide sufficient support for the asserted grounds will result in the Dean of Students (or their designee) determining that only certain asserted grounds should be submitted for review by the University Board on Discipline or that the appeal should be dismissed without further proceedings. When an appeal letter is accepted, the other party will be given a copy of the appeal letter and the opportunity to submit a written response within five University business days.

r.     No panel members who were involved in the original hearing will serve on the University Board on Discipline for the appeal. For appeals in sexual misconduct cases, the Board is comprised of at least one faculty member and up to two University administrators.  The University reserves the right to have a modified board hear the appeal when circumstances warrant it.

s.      The University Board on Discipline that hears the appeal can take the following actions: affirm the original decision of the hearing panel, affirm original decision of responsibility for some or all of the charges and change the sanction (sanction may be reduced or increased), reverse the original decision of responsibility for some or all of the charges, or remand the matter to the original hearing panel for further consideration.  Upon remand, if the original hearing panel affirms its prior decisions regarding responsibility and sanctions, the University Board on Discipline shall continue its review and render a decision on the original appeal(s).  If the original hearing panel reverses or modifies its original decisions regarding responsibility and/or sanctions, each party shall have a right to appeal to the University Board on Discipline.

t.      Except in cases involving the discovery of new evidence, the Board will review the hearing record, the appeal letter and response, and the decision and rationale of the hearing panel.  The Board may meet with the student who is making the appeal and the original hearing officer.  The other party may attend such meeting(s), but is not required to do so.  In cases where the appeal is based in whole or in part on a claim of newly discovered evidence, the Board will first determine if the offered evidence was not known at the time of the hearing and if it might impact the decision of responsibility or determination of sanction.  If the Board determines that the evidence was not known at the time of the hearing and that it might impact the decision of responsibility or determination of sanction, the Board will remand the case to the original hearing panel for review and the panel will issue a new decision letter taking into account the newly discovered evidence.

u.      The Board's decision will be communicated concurrently in writing to both the respondent and the complainant, normally within five University business days of the appeal hearing.  The decision of the University Board on Discipline is final, and no further appeal is permitted by either party.

v.      Knowingly filing a false complaint of harassment, discrimination, retaliation, sexual misconduct is a violation of this policy.

w.      Participants in this process, including the complainant and respondent, witnesses, investigators, supervisors/department chairs or their designees, and University officers may be directed to maintain appropriate confidentiality regarding the proceedings in order to protect the integrity y of the investigation, to protect the privacy rights of the individuals involved,

x.      A complaint alleging an intentional breach of confidentiality may be pursued.

y.    The University abides by the Family Education Rights to Privacy Act of 1974 which contains guidelines for handling and confidentiality of student records.

z.    Any retaliation, reprisal, or intimidation directed toward a complainant or anyone else as a result of reporting or participating in an investigation or adjudication of alleged sexual misconduct is strictly prohibited. Any incidents of retaliation should be reported immediately to Student Conduct and are considered a serious violation.

aa.    Unauthorized use, possession, or storage of any weapon or ammunition on University premises or at University sponsored activities is strictly prohibited. This includes, but is not limited to firearms, BB guns, air rifles, slingshots, paintball guns, swords, knives, tasers of any kind, ammunition, etc. Standard sanction: expulsion.

## FACTUAL BACKGROUND

### A.    Loyola University Maryland

13.    Defendant is a private university with a student population of approximately 4,000 undergraduate students.

14.    During the 2018-2019 academic year, the United States Department of Education ("ED") distributed billions of dollars to public and private colleges and universities for students attending their schools.  Upon information and belief, Loyola University Maryland was a recipient of such federal funding.

15.    A school specifically agrees, as a condition for receiving federal funds, to operate all of its programs and activities in accordance with Title IX and the Department of Education's Title IX regulations.  This agreement is known as an

"assurance of compliance." In this respect, Title IX is no different from other federal legislation that conditions the entitlement to federal funds on adherence to a federal regulatory scheme.

16.     Defendant, as a recipient of federal funds, is bound by Title IX and its regulations, and, upon information and belief, has executed an assurance of compliance.

### The Context of Collegiate Investigations for Sexual Misconduct

17.     On April 4, 2011, the OCR issued a guidance letter to colleges and universities in the United States, widely known as the "Dear Colleague" letter. The Dear Colleague Letter advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX and its implementing regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."

18.     In the wake of the "Dear Colleague" letter, the OCR commenced numerous investigations against colleges and universities finding in favor of female complainants because schools were unfairly handing females' complaints of sexual harassment and assault.

19.     The 2014 OCR Question and Answer emphasized female victims' rights and added extra requirements to colleges when investigating complaints by victims of sexual assault.

20.     The national press highlighted the wave of complaints, OCR complaints and lawsuits brought against colleges by female victims because schools were not treating female complainants fairly.

21.     Upon information and belief, Loyola was not following the requirements regarding its female complainants and was favoring male respondents in sexual assault complaints.  As early as 2014, Loyola's Student Government Association indicated that it was "trying to raise awareness" about campus sexual assault and encourage students to support the victims."

22.     Since 2015 in response to the complaints by female victims, there has been a wave of lawsuits by male accused students across the country against colleges and universities for unfairly favoring female complainants out of pressure to abide by the OCR's guidance and the government programs which had been favoring female complainants.

23.     This backlash began to turn the tide and, in the fall of 2016, OCR, for the first time, found in favor of a male accused student in an OCR investigation.

24.     Under the Trump administration, the trend to protect male accused students became even more apparent.  ED Secretary Betsy DeVos issued new OCR guidance rescinding the Obama administration's 2011 and 2014 OCR guidance in favor of rules designed to protect male accused students.  The media attention and debate made clear that the 2017 guidance was seen as protecting male students and pressuring schools to protect males accused students.

25.     On information and belief, due to the renewed emphasis on accused male students' rights and the loss of federal funding if a school did not comply with Title IX, there has been a nationwide trend favoring male student respondents over female student complainants accused of sexual misconduct because the OCR's enforcement of the 2017 Dear Colleague letter has become gender-skewed against women or has become widely understood by schools as such.

26.     In Title IX proceedings, Katsura Kurita, Defendant's Title IX Deputy for Students, indicated that Loyola would not change its procedures in response to the new 2017 guidance. The Defendant made no changes to the administration of the policy and no changes in the process because the school was already favoring male respondents.

27.     Students on Loyola campus continued to complain through 2020 that Loyola's process was unfair to female complainants. For example:

   a.     In 2020, many Loyola University Maryland students posted their experiences regarding sexual misconduct at the University and the administration's review of sexual misconduct claims to Instagram.  (Posts are found on Instagram the @dobettercampaign).   Several of the posts (including a former Resident Assistant), identified Katsura Kurita, Deputy Title IX Coordinator, by name, indicating that she demonstrated a consistent pattern of discouraging females from filing formal complaints of sexual assault.

   b.     On July 27, 2020, The Greyhound published a news article regarding the Instagram posts and the pressure being applied to the University's administration to correct the issues plaguing the school's sexual misconduct policy. (Quigley, Kaitlin, "Sexual Violence Allegations Linked to Loyola Surface on Instagram," The Greyhound, July 27, 2020).

   c.     In 2020, a petition was started on change.org by students at Loyola University Maryland.   The petition is entitled "Fire Katsura Kurita, Deputy Coordinator of Title IX at Loyola University Maryland."  As of May 20, 2021, there were over 1,300 signatures on the petition.

28.     On information and belief, Loyola was influenced by the pressure or coercion of the OCR's enforcement to continue to protect males and to skew procedures against females to demonstrate to the OCR that it would not favor women and would find accused women responsible for sexual misconduct and impose severe sanctions.

29.     On information and belief, Loyola was influenced by the pressure or coercion of the OCR's enforcement to continue to protect males and to skew procedures against females to demonstrate to the OCR that it would not favor women and would find accused men not responsible for sexual misconduct.

30.     Loyola had a financial incentive to refrain from challenging the legality of the OCR's enforcement.

31.     On information and belief, due to the local and national attention Title IX received, the Defendant was fully aware of the OCR oversight and sought to protect male complainants of sexual misconduct and harassment by skewing procedures against females as well to protect male respondents charged with sexual misconduct and harassment by skewing procedures against females.

32.     On information and belief, since 2017, the number of complaints by male Loyola students for sexual misconduct/harassment against females has increased significantly, while the number of complaints by female Loyola students for sexual misconduct/harassment against males has not similarly increased.

33.     On information and belief, since 2017, Loyola has treated male *complainants* of sexual misconduct/sexual harassment more favorably than female

complainants due to pressure from the OCR to protect males and to skew procedures against women and to demonstrate to the OCR that more Loyola male students are reporting sexual misconduct/sexual harassment and that Loyola would protect male complainants and would find accused women responsible for sexual misconduct and impose serious sanctions.

34.     On information and belief, since 2017, Loyola has treated male *respondents* of sexual misconduct/sexual harassment complaints more favorably than female respondents due to pressure from the OCR to protect males and skew procedures against women and to demonstrate to the OCR that more Loyola male students are reporting sexual misconduct/sexual harassment and that Loyola would find accused women responsible for sexual misconduct and impose serious sanctions.

35.     On information and belief, since 2017, female accused Loyola students invariably are found responsible in sexual misconduct/sexual harassment claims made by male QU students, regardless of the weight of the evidence, while male accused Loyola students are not.

36.     On information and belief, since 2017, female accused Loyola students invariably are found responsible and given more serious sanctions in sexual misconduct/sexual harassment claims made by male QU students, regardless of the weight of the evidence, while male accused students are not given as serious sanctions for similar or more egregious conduct.

37.    On information and belief, since 2017, in sexual misconduct/sexual harassment proceedings, Loyola has shifted the burden of proof to female respondents, unlike male respondents, requiring them to prove they are not responsible for the charged offenses, while Loyola requires female complainants, unlike male complainants, to prove male respondents are responsible, thus imposing a higher burden of proof on female students than on male students.

38.    On information and belief, Loyola's Title IX coordinator, investigators, Hearing and Appeal Panel members were not properly trained.

39.    On information and belief, since 2017, at Loyola, in sexual misconduct/sexual harassment claims, in he-said/she-said scenarios in which the complained-of incident has no witnesses other than the male and female, female accused students invariably are found responsible in complaints by male students, regardless of the weight of the evidence, while male accused are not.

40.    On information and belief, since 2017, at Loyola, in sexual misconduct/sexual harassment claims, in he-said/she-said scenarios in which the complained-of incident has no witnesses other than the male and female, female accused students invariably are found responsible and given more serious sanctions in complaints by male students, regardless of the weight of the evidence, while male accused are not given as serious sanctions for similar if not more egregious conduct.

41.   Against this backdrop, Loyola conducted its investigation of the claims against Jane Doe.

DocuSign Envelope ID: 11863794-6B46-456E-8D3C-1B82A0C03873

**The Night of January 20 and morning of January 21, 2019**

42.     At approximately 10:00 p.m., on January 20, 2019, Plaintiff, John Doe and approximately eight (8) others were visiting, playing cards and drinking alcohol in Plaintiff's dorm room in Flannery O'Connor dorm over the course of the evening.

43.     During this time, John Doe consumed alcohol from a bottle in his backpack.

44.     Plaintiff also consumed alcohol, in the form of two Smirnoff Ice bottles and two (2) shots of vodka.

45.     Eventually, the party broke up, and Plaintiff ended up alone in her room with John Doe, with both parties sitting the floor.

46.     After the room cleared out, Plaintiff and John Doe talked about and showed each other their tattoos.

47.     After several minutes of talking, Plaintiff asked John Doe if she could kiss him.

48.     John Doe said "yes."

49.     Plaintiff and John Doe then kissed for several minutes.

50.     John Doe went to the bathroom and then removed his shirt.

51.     When John returned to Plaintiff's room, he began kissing Jane Doe again.

52.     While Plaintiff and John Doe were kissing on her bed, there was a knock at Plaintiff's door.

53.     Answering the door, Plaintiff found fellow students Kayla and Dominic there who wanted to give Plaintiff an update on a friend who had made a suicidal statement earlier in the evening and to get a friend's slippers.

54.     Both witnesses stated John Doe was on Plaintiff's bed with his shirt off at the time.

55.     After the visitors left, John Doe removed his pants and asked Plaintiff if they could "fuck."

56.     Plaintiff told John Doe that they had to wait for a few minutes because Plaintiff's roommate had texted and said she needed something from the room.

57.     While Plaintiff and John Doe waited for Plaintiff's roommate to get back, and then leave again, they talked and Plaintiff asked John Doe if he was sure he wanted to have sex.

58.     Jane Doe removed her clothes, leaving just under garments on.

59.     Plaintiff's roommate knocked and Plaintiff put her clothes on and answered the door. After Plaintiff's roommate left, John Doe again asked Plaintiff if they could "fuck."

60.     Plaintiff asked if he still wanted to have sex, John Doe pointed at his erect penis inside his boxers and said suggestively, "what do you think?"

61.     John Doe took off his own boxers and laid on his back on Plaintiff's bed. Jane Doe removed the rest of her undergarments at this point.

62.    John Doe then leaned forward and grabbed Plaintiff by the hips and moved her into a straddling position on top of him.

63.    While Plaintiff was straddling John Doe, he grabbed her hips very roughly causing bruising.

64.    Joe Doe then flipped Jane Doe over and pushed her underneath him and without her consent stuck his fingers roughly into Plaintiff's vagina and roughly thrust his fingers in and out mulitple times causing bleeding and lacerations.  He had given no earlier indication he was going to do this or asked to do this action.  He at this point had assumed the dominant positon on top of her and she could not see his hand or where it was going.

65.    This was painful for Plaintiff and caused her to bleed from her vagina, with blood getting on her sheets.  Plaintiff gasped and physically recoiled in pain pulling her legs toward her and said nothing out of shock and pain.    Plaintiff then remained still, hoping that this would cause the act to end quicker and for the pain to be over. After several minutes, John Doe removed his fingers.

66.    Plaintiff did not give her consent for that or any following actions. She did not say anything because she was shocked and scared because she was much smaller than he and was worried he could hurt her.

67.    John Doe reached for his backpack on the ground by the foot of the bed to retrieve his wallet with the condom in it, a Trojan extra thin grey condom, in it. John Doe placed his condom on his own erect penis.

23

68.     John Doe then assumed the dominant position again putting his entire weight on top of her.  He held her tight with arms on either side of her shoulders squeezing in very hard and penetrated her with his penis and began thrusting. He began kissing her roughly and pressing down on her neck.

69.     John Doe asked Plaintiff if he could choke her.  Plaintiff was still in shock and afraid of what happened and what he would do next, and said she was not sure. She did not want to be choked.

70.     John Doe ignored this and then put his hands forcefully around Plaintiff's neck and squeezed hard choking her causing her pain and to be unable to breathe.

71.     Plaintiff felt trapped and very scared and that she could not move from underneath him. As he choked her, he began thrusting again.  Plaintiff felt very unsafe.

72.     As John Doe choked Plaintiff, he also inserted his penis into Plaintiff's vagina and started to thrust.

73.      Plaintiff could not speak or breathe, and she grabbed his hands and tried to push them off her neck.

74.      John Doe kept thrusting and choking her.  After unwanted thrusts of his penis into her vagina, Plaintiff pushed at John Doe's hands again and she pushed his hands off of her neck, resulting in redness and bruising on her neck.

75.     After Plaintiff removed John Doe's hands from her throat, John Doe placed his hands on either side of Plaintiff's head and pushed his forearms and elbows

onto Plaintiff's shoulders and clavicle, causing pain in both of her shoulders and in her chest.

76.     While John Doe was on top of Plaintiff, he had her pinned down and made vulgar comments to her in a forceful way several times saying "take it like a little slut" and calling her "a little slut" several times, which Jane Doe did not like and which made her extremely uncomfortable.  Plaintiff did not anticipate or want to be verbally or physically assaulted by John Doe in this manner.

77.     John Doe then asked Plaintiff to scratch his back, which she did lightly out of fear and confusion.

78.     John Doe then told Plaintiff to scratch him harder, and she complied out of fear.

79.     As Jane Doe scratched his back, John Doe ejaculated into the condom, pulled his penis from Plaintiff's vagina, and sat up on the bed.

80.     After that, John Doe removed the condom from his penis, threw it onto the floor, and started to get dressed. Confused and scared, Plaintiff very quietly asked if John Doe ejaculated, and he responded with "yes."  That is all that he said to her that evening.

81.     John Doe went to the bathroom. When he returned, Plaintiff tried to talk with John Doe to understand what had happened, but he refused to engage in conversation with Plaintiff. He then used his phone to call his friend Zoe to ask her to come get him so he could get into his dorm Hammerman Hall.

82.     John Doe then called his friend Chuck and told Chuck that he was still in Plaintiff's room and was coming to Hammerman.

83.     Around that same time, John Doe also texted his friend Eddie, and then Zoe.

84.     When Zoe and Chuck arrived at Plaintiff's dorm room together, John Doe packed up his backpack and left with them. He left the used condom and an open hunting knife on the floor of Plaintiff's room.

**John Doe Leaves Plaintiff's Room**

85.     After leaving Plaintiff's room, John Doe later claimed he broke down in the hallway, stating that had been raped.

86.     However, John Doe was able to walk and went to Hammerman.

87.     Once at Hammerman, John Doe was cogent and conversed with multiple people, including calling his ex-girlfriend, who later observed the scratches on John Doe's back.

88.     John Doe and several witnesses describe the scratches as "severe;" however, photographs taken on January 21, 2019, do not support that contention.

**Plaintiff's Actions Following the Assault by John Doe**

89.     Plaintiff stayed in her room that night and awoke to find a used condom on the floor along with a hunting knife left in the open position.

90.     Plaintiff, who was a past survivor of sexual assault, told no one what happened because she was traumatized and was trying to sort out and understand what happened and how this could have happened to her.

91.     The next day, John Doe preemptively filed a charge at the school Title IX office with Title IX Deputy Coordinator for Students,  Katsura Kurita ("Kurita") against Plaintiff falsely claiming that Jane Doe had sex with him without his consent due to his incapacitation by alcohol to preempt any charge by her of sexual assault by him.

92.     On January 23, 2019, Plaintiff was verbally informed of the charges against her initiated by John Doe, and received an email from Kurita, stating that Loyola had issued a mutual no contact order between Plaintiff and John Doe.

93.     Plaintiff was extremely upset and shocked because the charges were false. Plaintiff called her mother and told her what happened.

94.     The Plaintiff and her mother met with Kurita and asked if they could also file a complaint against John Doe. Kurita tried to dissuade Plaintiff from filing a complaint. Plaintiff's mother pressed her and Kurita reluctantly said that the Plaintiff could file her own complaint.

95.     When talking with Kurita, Plaintiff told her that she had bruises from John Doe's sexual assault of her.  Kurita advised her to take pictures.

96.     In addition to the mutual no contact order, the letter forbade Plaintiff from discussing the events with "any student at Loyola University unless this matter has been referred for an official university action."  (Emphasis in original).

97.     This was in contradiction in the terms of university guidelines, which stated: "any directives regarding confidentiality shall not impede the parties' ability to obtain and present evidence or otherwise support or defend their interests" and undermined Plaintiff's ability to defend herself.

98.     However, even with the no contact order, John Doe was seen around and near Plaintiff's dorm, even though he was prohibited from doing so and was a day student.

99.     Plaintiff obtained legal counsel due to the accusations against her, and due to Kurita dissuading her form filing a complaint and submitted her claim of sexual assault against John Doe. At that meeting, when reviewing the Plaintiff's claim, Kurita stated that the weapons charge because John Doe possessed the hunting knife would result in his expulsion.

100.    On January 23, 2020, Plaintiff was in pain and extremely upset and she returned to her family home in Virginia.  On January 24, 2019, Plaintiff went to a doctor's office for evaluation and treatment of the injuries she suffered during the sexual encounter with John Doe.

101.    There, a doctor performed a full examination on Plaintiff, which included taking photographs of the visible bruising and swelling on Plaintiff's shoulders, hips, and neck.

102.    Plaintiff also had her roommate take photographs of the bruises on her neck, shoulders, and hips.

103.    The doctor's report showed the physical examination of Plaintiff's vagina showed a 1-cm first-degree vaginal tear at the introitus on the superior aspect.  The report set forth that Plaintiff had abnormal uterine and vaginal bleeding, laceration of the vagina, pain in shoulder, hips, and back, and was a victim of sexual abuse.

104.    X-rays were ordered, and Plaintiff was referred for physical therapy for the pain in her neck, shoulder, and hips from the sexual encounter with John Doe.

105.    Plaintiff continued to undergo physical therapy for the pain in her neck, shoulder, and hips for months.

106.    Plaintiff was in counseling due to the anxiety and emotional suffering she experienced due to the sexual assault. She was placed on additional anxiety medications by a psychiatrist during the investigation process and began to have flare ups of Panic Disorder that was previously in remission.

107.    Plaintiff was diagnosed with post-traumatic stress disorder (PTSD) in relation to the encounter with John Doe and is currently in counseling.

108.    One investigation ensued for both their complaints where Plaintiff and John Doe each were treated as both a complainant and respondent regarding the events of January 20.

**The Flawed Investigation and Flawed Investigative Report**

109.    Title IX Coordinator Kurita commissioned an investigation to be conducted by an investigator, Stephanie P. Karn, an attorney who works on behalf of businesses and universities.

110.    The investigator interviewed both Plaintiff and John Doe, as well as other students who were present in Plaintiff's room on the night in question.

111.    After gathering evidence, the investigator prepared a written report that was intended to summarize and analyze the evidence and investigative findings for presentation to the Hearing Panel.

112.    The investigative report was not reliable, impartial or thorough and failed to include exculpatory evidence for the Plaintiff and was biased in favor of John Doe due to his gender in the following ways.

113.    The investigator failed to interview key witnesses including Plaintiff's mother, as an outcry witness; her therapist regarding her mental state and diagnosis as corroboration of having been sexually assaulted; and her medical treatment providers regarding her immediate visit to the doctors regarding her sexual assault and resulting injuries including their medical opinion about how the injuries could have happened, all of which would have corroborated Plaintiff's complaint of sexual assault.

114.    The investigator interviewed more witnesses for John Doe who were his friends than for Jane Doe.

115.    The investigative report relied on John Doe's close friends' statements in its findings but failed to ask any questions regarding their relationship with John Doe or any other questions to discover if there was any bias of these witnesses, whether they had any motive to testify to untruthfully in favor of John Doe or whether they had

spoken with John Doe at any point before the interview to see if there had been any undue influence.

116.    The investigative report showed that John Doe was discussing the case with at least one witness, Zoe, as she could have only known about the knife by discussing it with John Doe and yet she explained the presence of an open hunting knife away to the investigator.   The investigator failed to ask Zoe and John Doe any questions about when they and about what had spoken in order to determine if John Doe had influenced the witness's testimony which would have weighed against his credibility and undermined the reliability of the information Zoe offered.

117.    The investigator failed to ask John Doe any questions about an alternative motive for his filing the sexual assault complaint. There were no questions or consideration given or analysis by the investigator or [Hearing Panel] that the 'rape' claim could be false or fabricated, or that in fact John Doe committed a forcible sexual assault against Plaintiff and made the complaint as a preemptive move in anticipation that Jane Doe would be filing a sexual assault complaint based on his actions.  If he filed the complaint first then it could be viewed as retaliatory if she then filed a complaint.

118. The investigator failed to ask John Doe about his numerous inconsistencies in his statements, including for one example, his statement and his friends' statement that he told multiple people that same night that he had been raped by Plaintiff even though he claims he blacked out and cannot remember anything after

he and Plaintiff were kissing and he came to only when he called Zoe—he remembered nothing in between that.

119.   The investigator failed to ask John Doe about discrepancies with John Doe's account of what happened in the room alone with Plaintiff and failed to analyze and ask questions about John Doe's description of events to determine if his account was even physically plausible or to uncover inconsistencies when being questioned.

120.   For example, the investigator failed to ask any questions of John Doe or include in the investigative report the implausibility of the claim of sexual assault by the Plaintiff including the size difference between Plaintiff and John Doe.  John Doe was approximately 5 feet 8 inches tall and weighed 150 pounds.  Plaintiff is 4 feet 11 inches tall and weighed 122 pounds.

121.   The investigative report's findings and conclusions omitted facts, evidence and any analysis that supported Plaintiff's statements, either as a respondent or a claimant.  Instead, the investigator chose to include facts and analysis that supported John Doe's complaint as a victim and defense as a respondent.

122.   The investigative report in its tone, organization, content and language was primarily focused on locating and presenting evidence that supported John Doe's charges against Plaintiff and minimized Plaintiff's charges against him.

123.   The investigative report's findings and conclusions failed to include overwhelming evidence that proved that Plaintiff did not commit sexual assault due to Jon Doe's claimed incapacitation.

124.    The investigative report's findings and conclusions did not include or analyze the actions of John Doe before, during, and after the sexual encounter in which it was clear that John Doe had the capacity to consent to the sexual contact and did in fact initiate and consent to the sexual contact with Plaintiff.

125.    The investigative report's findings and conclusions did not include or analyze undisputed evidence that demonstrated that John Doe was able to communicate effectively and was not incapacitated but rather that he initiated sex with Plaintiff, including: undressing himself, placing plaintiff on top of him,  pushing her underneath him, retrieving his condom from his wallet, putting on his own condom, telling Plaintiff that he wanted to fuck her, initiating sex with Plaintiff, choking Plaintiff from a superior position, calling Plaintiff lewd names, having an reception, removing own condom, unlocking his phone and texting and Facetiming with friends immediately after having sex, and leaving an open knife in Plaintiff's room.

126.    The report minimized exculpatory evidence submitted by the Plaintiff. Indeed, during the Hearing, one witness, Brendan, communicated that his statements to the investigator that supported Plaintiff as the victim appeared to have been minimized.

127.    The investigative report's findings and conclusions failed to include the facts that demonstrated that Plaintiff had no knowledge and should not have known that John Doe had been drinking enough alcohol to be incapacitated.

128.    The investigative report's findings and conclusions completely omitted and failed to analyze overwhelming physical evidence that supported that Plaintiff did

not commit sexual assault and that John Doe did.  The investigative report's findings and conclusions did not include, and the report did not evaluate or analyze the injuries that Plaintiff suffered from John Doe that showed that she was victim of sexual assault. None of the care providers for Jane Doe were contacted or interviewed by the investigator, and none of the medical reports were analyzed in the investigator's findings and conclusions within the investigative report.

129.    The investigative report findings and conclusions did not address the medical report that described Plaintiff's injuries, or the medical assessment that Plaintiff was the victim of sexual assault.

130.    The investigator and the report were biased and did not gather evidence and facts that could serve to exculpate Plaintiff.  Rather, the investigator was singularly focused on in discovering and presenting information to support that John Doe was unable to provide consent shifting the burden to Jane Doe to prove that she was the victim of sexual assault.

131.    The investigator was biased and purposefully did not completely or objectively investigate Plaintiff's complaints against John Doe.

132.    The investigator was appointed by Kitsura. Upon information and belief, the investigator's actions were motivated by her desire to continue to be hired by Kitsura and protect the University from any claims of violations of Title IX by OCR and pressure to comply with OCR's message to protect male students. Defendant wanted to clearly demonstrate that it would aggressively pursue sexual misconduct

claims against females who are accused of sexually assaulting males, in an effort to demonstrate that they are not gender biased against males.

133.    The Investigative report was the primary document that the Hearing Board was to rely upon. The omission of crucial information and analysis in the report led to the Hearing Panel incorrectly determining that John Doe was incapacitated and unable to give consent during the sexual encounter with Plaintiff.

### The Flawed Hearing and Determination of Responsibility

134.    The Hearing occurred on May 13, 2019.

135.    The Panel included David Hula, Associate Professor of Political Science, Mary Ellen Wade, Associate Director of Messena, and David Tiscione, Loyola University Maryland's Director of Student Conduct and Chair of the Hearing Panel ("Tiscione").

136.    During her testimony, Plaintiff described her interactions with John Doe, who she described as an active and alert participant during the sexual encounter, and who was very aggressive physically and verbally as set forth above in ¶¶42-84. She also described that John Doe was not slurring, that he did not throw up, and that he had no trouble walking or physically functioning or talking.

137.    In his testimony, John Doe claimed to recall events up until he was in Plaintiff's bed, at which point he claimed he recalled not wanting to have sexual contact with Plaintiff, but being unable to move, and then he recalled nothing until he left Plaintiff's room with Zoe and Chuck.  The Panel asked no further questions about this

DocuSign Envelope ID: 11863794-6B46-456E-8D3C-1B82A0C03873

and took John Doe's statement at face value.   John Doe did not dispute Jane Doe's version of what happened, which directly contradicted his statement that he could not move.

138.    Plaintiff, John Doe, and a witness were the only people that were questioned by the Panel.

139.    On May 29, 2019, Plaintiff received a letter from Defendant informing her that she had been found responsible for Sexual and Gender Based Misconduct: Sexual Assault, and that John Doe had been found not responsible for digitally or vaginally penetrating Jane Doe or for pinning her down and forcing her to have sex without her consent, or for physical conflict including for acts of violence, including pushing and slapping and physical threats.  John Doe had been found responsible for sexual verbal abuse and sexual assault but only for choking her.

140.    The Panel accepted Jane Doe's version of what happened in making its findings and in light of the fact that her version of the sexual encounter was not disputed.

141.    In finding John Doe Responsible for verbal abuse, the panel found Jane Doe's report of his multiple uses of vulgar language and that it was unwanted "credible because she was consistent when she reported it to the investigator and the panel and there was no evidence in conflict in her report."

142.    In finding John Doe responsible for sexual assault for choking her, the Panel again accepted Jane Doe's version of what happened with the choking and her

DocuSign Envelope ID: 11863794-6B46-456E-8D3C-1B82A0C03873

level of discomfort and found her account "credible because she was consistent in the times she reported it and she had visible red marks on her neck."

143.   The Panel found John Doe Not Responsible for digital and vaginal penetration and sexual acts against her consent, because Jane Doe when she earlier agreed to have sex, she expected to have vaginal penetration. The Panel explained that because she had expected penetration to happen and "waited for it to get better,"  that she had affirmatively consented to penetration and did not withdraw consent.

144.   The Panel found John Doe Not Responsible for pinning her down because they concluded that "bodily contact such as this was not a different sex act and though there were reported injuries from the interaction, there was no evidence of withdrawal of consent being expressed."

145.   The Panel found John Doe Not Responsible for acts of violence, including pushing slapping and physical threats. The panel concluded that the hard grasping of her hips, the hands and arm positions causing her bruising, were not violent because he did not intend to harm her. They found the choking, though dangerous, was not violent because it was a sexual act not intended to cause harm.

146.   The letter also informed Plaintiff that she would be suspended from Loyola from May 29, 2019 through January 12, 2020, have deferred suspension from January 12, 2020 until January 12, 2021, continue to have no contact with John Doe, and be required to complete Substance Education prior to December 6, 2019.  The Panel gave the same sanctions to John Doe.

**Problems with the Hearing and the Determination**

147.    The Hearing Panel, its findings and the Hearing were incomplete, unfair, and biased against Jane Doe based on her gender in violation of Title IX and Loyola's Handbook, Title IX Policy and publications for, among others, as set forth below.

148.    The Hearing Panel relied heavily upon the flawed investigative report when making its determination on the sexual misconduct allegations that were lodged against Plaintiff and did not conduct further investigation to cure those defects.

149.    Tiscione reported to the Appeals Board that the Panel placed great emphasis on witness statements from the report (and not the facts, physical evidence, or Plaintiff's statements as captured in the report). These were the witnesses that the investigator had failed to ask any questions regarding bias including whether the respondent had improperly influenced, and witnesses that the Panel did not call at the hearing and were therefore unable to be asked any questions by the panel of Jane Doe and have their credibility assessed.

150.    The Panel failed to use the proper definition of incapacitation as set forth in the Loyola's Handbook.

   a.   Loyola defines incapacitation in pertinent part as "not able to effectively communicate or to understand the nature of the conduct being engaged in as a result of incapacitation due to consuming . . . alcohol . . . ."

   b.   In finding Jane Doe Responsible for sexual assault due to incapacitation, the Panel broadly concluded that John Doe was incapacitated because he was

not able to effectively communicate before sexual intercourse. The Panel failed to analyze and find the necessary element that the ineffective communication was a result of incapacitation by alcohol, which is commonly defined as and understood to mean "a state beyond drunkenness or intoxication." John Doe confirmed that he was claiming that he was incapacitated due to alcohol.

c.   The Panel relied on its findings that John Doe could not effectively communicate based on one witness' statement in the Investigative report that John Doe was saying actual words but they did not make sense to her. There were no questions or facts in the Investigative report about that witness's state of mind at that night, what the words were or how long she saw John Doe. The Panel never inquired about this during the hearing nor did the Panel hear from this critical witness, who did not testify in the hearing, nor was this witness ever subject to cross examination by the Plaintiff.

d.   Tiscione later stated at the Appeal Hearing that the initial Hearing Panel made their decision based upon corroborating witness reports documented in the report that John Doe was drunk. Being drunk is a lower standard than being incapacitated and a finding of incapacitation cannot be made based on the Panel's determination that John Doe was drunk.

e.   The Panel's conclusion that John Doe could not effectively communicate because he was drunk does not meet the necessary definition of incapacitation

and cannot form the basis for a finding of responsibility against Jane Doe on the ground of John Doe's incapacitation.

151.   The Panel's conclusion that John Doe was incapacitated was not supported by a preponderance of the evidence and had the Panel applied the correct standard, it would have found Jane Doe not responsible.

    a.   It is undisputed that John Doe was drunk which the evidence shows.

    b.   In its findings, the Panel accepted Plaintiff's statement about what happened as consistently described in her statement and at the hearing as credible and that Jane Doe's account was undisputed since John Doe allegedly could not remember. But the Panel's findings completely omitted in its findings and conclusions those same facts in Jane Doe's version they accepted as credible (and used to make other findings) that show that John Doe was not incapacitated; such as testimony that he was lucid, speaking, walking, not slurring, and engaging in physical acts and making decisions including but not limited to:

- The absence of any evidence John Doe objected to the sexual contact.

- The fact that John Doe got up and went into the bathroom on his own and used his phone, (unlocking and texting clearly) by himself.

- The fact that John Doe undressed himself down to his underwear and got into Plaintiff's bed of his own accord.

- The fact that John Doe asked Plaintiff if they could "fuck" several times.

- The fact that when Plaintiff asked if John Doe was sure he wanted to have sex, and he pointed to his erection and said, "what do you think?"

- The fact that John Doe remained in Plaintiff's room and on her bed even as multiple people stopped by.

- The fact that John Doe removed his own underwear, got off the bed and went to his wallet, pulled out his own condom, and put it on himself.

- The fact that John Doe was an active participant in the sex, getting on top of Plaintiff and asked her if he could choke her.

- The fact that John Doe choked Plaintiff during sex.

- The fact that John Doe physically penetrated Plaintiff digitally with excessive force, squeezed her harshly, asked Plaintiff to scratch him, called Plaintiff obscene names, and ejaculated.

- The fact that John Doe removed the condom on his own and threw it on the floor.

- The fact that John Doe got himself dressed without any assistance.

- The fact that John Doe Facetimed and texted several people immediately after sex.

- The fact that John Doe packed up his own backpack, took out his knife, opened his knife and left it on the floor.

- The fact that John Doe carried his own backpack as he left the room.

- The fact that John Doe spent the remainder of the night immediately after having sex walking around, cognitive and able to ambulate, talking coherently to everyone about what his version of what happened.

- The fact that John Doe is much larger than Plaintiff and any notion that Plaintiff physically could have forced, threatened or intimidated John Doe into sexual activity is without merit.

c.   In finding Jane Doe Responsible for sexual assault due to incapacitation, the Panel broadly concluded that not only John Doe was incapacitated because he was not able to effectively communicate before sexual intercourse but that Jane Doe should have known he was incapacitated, which is a necessary element of a finding of incapacitation.  While there was evidence that Jane Doe knew John Doe was drunk, there is no evidence in the record that Jane Doe knew how much alcohol John Doe had had to consume or that she was aware of anything that would have caused her to be aware that he was incapacitated – to the contrary, everything she observed during the night and sexual encounter led her to believe the opposite.

d.   At the appeal, Tiscoine stated: "If someone's incapacitated, the rest of it doesn't matter, because someone cannot give consent whose incapacitated. Once we met incapacitation, we did not look at anything else . . ." This statement omits the necessary analysis regarding whether Jane Doe knew or should have known reflecting the wrong standard and the lack of training.

e.    The Panel's conclusory statement that Jane Doe knew or should have known John Doe was incapacitated without any evidence to support that is insufficient evidence --and well below a preponderance of the evidence – to find that Jane Doe was responsible for sexually assaulting John Doe.

152.    Moreover, the Panel (and the investigator) failed to do a thorough investigation and exploration into incapacitation. The Panel simply relied on John Doe's statement that he was blacked out and therefore was incapacitated. The Panel failed to ask questions or consider that even if a person is blacked out that individual can act coherent and normal to others, which any trained Panel member would know.

153.    The Panel failed to call an expert witness to discuss the effect of blackout on an individual and that the fact that someone suffers a blackout is not proof they either are or appear to be intoxicated or incapacitated.

154.    The Panel relied on John Doe's statement about the quantity of alcohol he had consumed that evening to find he was drunk and therefore incapacitated. The Panel failed to call an expert witness to evaluate John Doe's alleged amount of alcohol he had consumed that night who would have likely concluded that that amount in the time frame alleged based on John Doe's stature would have led to stupor or coma, thus undermining John Doe's claim that he had consumed that much alcohol and negatively affected his credibility.

155.    The Panel failed to use the proper definition of consent, and had it done so, it would have found by a preponderance of the evidence that Jane Doe did not

consent to the digital and vaginal penetration and other acts and would have found John Doe responsible for sexual assault.

a.   Loyola's Handbook sets forth that "'consent' is defined as an affirmative indication by words and/or actions of a voluntary agreement to engage in the particular sexual act or conduct in question. . . . Consent for one sexual act or conduct does not constitute consent to all sexual acts or conduct. . . . Consent can be withdrawn at any time, and once withdrawal of consent has been expressed, sexual activity must cease. . . . Silence or absence of resistance on the part of an individual does not constitute their consent."

b.   Jane Doe had agreed that she and John Doe could engage in sex that night. This was not consent to a particular sexual act as required in the definition.  Jane Doe had consented to the kissing by John Doe by her actions by kissing him back.  Jane Doe's consent to kissing did not constitute consent to other sexual acts. Jane Doe did not verbally or physically consent to any further sexual act. She did not say anything and even if she had not resisted, that still would not have constituted her consent to any further acts. On the contrary, however, she physically recoiled, gasped and drew her knees up when he roughly digitally penetrated her and did not consent to any further sexual acts.

c.   Tiscione asked several leading and inappropriate gender-biased questions after Plaintiff stated that the digital penetration performed by John Doe was not asked for and was unwelcome. He determined that Plaintiff never said 'No,' and

therefore she consented to the forced pinning down and penetration by John Doe, which is contrary to the Loyola definition of consent and is based on sexual stereotyping.

d.   Loyola's Handbook sets forth that "Consent cannot be obtained through the use of force, threat, intimidation, or coercion."

e.   At the appeal, Tiscoine stated: "So the way that um, we are trained, and as a national best practice in assessing for, or deliberating for sexual assault, I know I said this before, but just to go over it again, first you go with force, threat, and intimidation. If there's any force, threat, or intimidation, the rest of it doesn't matter because someone cannot give consent with force, threat, or intimidation."

f.   The Panel failed to use the proper standard to correctly determine that John Doe's acts, including putting Jane Doe on top of him, gripping her hips tight enough to leave bruises, pushing her under him, forcefully digitally and vaginally penetrating her, and pinning her down with his body weight and arms were all nonconsensual because Jane Doe did not affirmatively consent to any of these acts and any perceived consent was obtained by force and intimidation.

156.   The Panel's conclusion that Jane Doe had consented was not supported by a preponderance of the evidence and had the Panel applied the correct standard, it would have found John Doe responsible for sexual assault

a.   The Panel failed to analyze overwhelming physical evidence that supported that Plaintiff did not commit sexual assault.  The Panel's (and the

investigative report's) findings and conclusions did not include, evaluate or analyze the injuries that Plaintiff suffered from John Doe that showed that she was a victim of sexual assault, including the vaginal tears, and hurt shoulder, back, and hips that required x-rays and months of physical therapy.

b. The Panel's (or the investigative report's) findings and conclusions did not include, evaluate or analyze Jane Doe's diagnosis of PTSD that her therapist said she suffered in relation to the encounter with John Doe that corroborates that she was a victim of sexual assault.

c. The Panel's (or the investigative report's) findings and conclusions did not include, evaluate or analyze the evidence showing that Plaintiff was in constant fear of running into John Doe, or isolating herself alone in her room for the remainder of the school year out of fear of running into John Doe, which are all evidence of trauma from a sexual assault and corroborates Plaintiff's complaint that John Doe assaulted her.

157. The Panel used the wrong definition of physical contact. Had they used the proper one, it would have found John Doe responsible for physical contact.

a. The definition of physical contact does not include the intent to harm.

b. The Panel unilaterally concluded that the hard grasping of her hips, the hands and the arm positions causing Jane Doe bruising were not violent and John Doe was not responsible for violating the physical contact provision because he did not intend to harm her.

    c.   John Doe testified he could not remember what happened, and there is no evidence that he did not intend to harm her. The Panel found the choking, though dangerous, was not violent because it was a sexual act not intended to cause harm. The Panel determined that because he could not remember he did not intend to harm her.  This determination that these acts were not intended to harm Jane Doe was contrary to Jane Doe's evidence and the only evidence in the record regarding the physical acts and was biased in favor of John Doe.

158.   Plaintiff, John Doe, and only one witness was questioned by the Panel.

159.   The one witness was interviewed by phone preventing the Panel from assessing the nonverbal cues to be able to make an accurate credibility assessment.

160.   The Panel failed to call key witnesses from the investigative report—including Zoe, Chuck, other friends that saw John Doe that night after the sexual encounter and Plaintiff's roommate—for the hearing. Indeed, the Panel did not call the investigator herself as a witness at the hearing.

161.   No questions were asked about the investigator's methods, findings and credibility assessment of the witnesses she interviewed because the investigator was not called as a witness by the Panel preventing the Panel from having any basis from which to assess credibility of this important witnesses.

162.   None of the missing witnesses were asked questions by the Panel.

163.   None of the missing witnesses' credibility could be ascertained by the Panel.

164.    Plaintiff was deprived of the opportunity to ask questions of the missing witnesses.

165.    The Panel (as well as the investigator) failed to conduct a complete and thorough investigation and failed to carry Defendant's burden to prove that sexual assault occurred when it failed to interview key witnesses including Plaintiff's mother, as an outcry witness; her therapist regarding her mental state and diagnosis as corroboration of having been sexually assaulted; and her medical treatment providers regarding her immediate visit to the doctors regarding her sexual assault and resulting injuries including their medical opinion about how the injuries could have happened, all of which would have corroborated Plaintiff's complaint of sexual assault and provided relevant evidence for her defense.

166.    The Panel failed to include as a witness a medical expert to show that Jane Doe's injuries were likely the result of force and sexual assault. Instead, the Panel used Plaintiff as a medical expert and asked her questions about the meaning of the medical report, and the medical terms included therein.

167.    The Panel failed to ask John Doe any questions about an alternative motive for filing the sexual assault complaint. There were no questions or consideration given or analysis by the investigator or Hearing Panel that the 'rape' claim could be false or fabricated, or that John Doe committed a forcible sexual assault against Plaintiff.

168.   The Panel failed to ask John Doe about his numerous inconsistencies in his statements, including for example, his statement and his friends' statement that he told multiple people that same night that he had been raped by Plaintiff even though he claims he blacked out and cannot remember anything after he and Plaintiff were kissing and he came to only when he called Zoe—he remembered nothing in between that.

169.   The Panel failed to ask John Doe about discrepancies with John Doe's account of what happened in the room alone with Plaintiff and to analyze and ask questions about John Doe's description of events to determine if his account was even physically plausible, including failing to ask questions about the size difference between Plaintiff and John Doe.

170.   The Panel failed to ask any bias questions about John Doe's witnesses regarding the extent of the relationship with John Doe (it would have discovered they were all very close friends) but asked bias questions about Jane Doe's witnesses.

171.   The Panel chose to treat John Doe as a complainant first and ask him questions about his complaint that Jane Doe sexually assaulted him. The majority of the Panel questioning was based upon the investigative report and John Doe's complaint that he was too drunk to consent to sex.  The Panel interviewed Jane Doe in the first part but only as a respondent and did not ask her any questions about her complaint that John Doe sexually assaulted her.  As a result, the Panel did not address Plaintiff's complaint that John Doe had assaulted her until after they were finished focusing on John Doe as an alleged victim. Plaintiff's case did not receive anywhere

near the same scrutiny as John Doe's complaint. Moreover, treating her as a respondent first and spending more time on that left the impression that Jane Doe was responsible before she was asked any questions about her complaint and removed the presumption of innocence and tainted her case as a complainant.

172.   Tiscione demonstrated obvious bias in favor of John Doe throughout the line of questioning.  He peppered Plaintiff with repeated and specific personal questions about whether she wanted sex as the act was occurring to try to show that she consented to the sexual acts which she claimed were rape. In contrast, he asked very few questions of John Doe about what happened in the room alone with Plaintiff.

173.   The Panel retraumatized Jane Doe by asking over and over about incident and focused on the sexual details both as a respondent first and then as a complainant rather than combining the status and asking the question only once. On the contrary, the Panel did not ask John Doe any questions at all about the incident.

174.   Tiscione stated later in the Appeal Hearing that the Hearing Panel did not need to ask these questions because John Doe had already said he could not remember and he unilaterally determined that any questions would be considered as antagonizing John Doe as the complainant while not affording Plaintiff the same consideration.

175.   Tiscione repeatedly asked Jane Doe the same questions at different times that required her to repeatedly answer them and set her up to have inconsistencies when they did not do that for John Doe.

176.    The Panel scoured the record and asked her about immaterial potential inconsistencies and did not do that for John Doe; in fact, the Panel did not ask him about any of his inconsistencies.

177.    The Panel failed to consider any minor inconsistencies of Jane Doe's as consistent with being a victim of sexual assault as shown by research on sexual trauma, while the Panel took John Doe's statement that he forgot everything as a result of trauma at face value.

178.    John Doe was allowed to ask cross examination questions to Plaintiff at the Hearing.

179.    Plaintiff was not allowed to cross-examine John Doe during the investigation or the Appeal Hearing and was prevented from having a fair and impartial opportunity to present a defense. The Panel excluded Plaintiff's 150 questions that would have tested John Doe's credibility and unearthed information and showed inconsistencies in his testimony.

180.    This lack of cross-examination was particularly important in *this* case, since Tiscione and the Panel did not ask probing questions of John Doe, despite the numerous weaknesses in the version of events he presented, the inconsistencies and implausibility of his version of the events and that this was a "he said she said" scenario where there were no witnesses to the conduct at issue. This was particularly unfair and biased as the Panel allowed John Doe to ask his cross-exam questions of Jane Doe but

refused to allow her to ask her 150 questions because the Panel presumed that John Doe would have no answers because he did not remember.

181.    The Panel asked Jane Doe questions that contained factually incorrect information and confused her and confused the issue and made it appear as if she was not being consistent—while the Panel did not ask incorrect questions and did not confuse John Doe.

182.    The Panel failed to properly assess credibility.

   a.    The Panel relied on Jane Doe's version of the sexual encounter as credible because it was consistent to find John Doe responsible for some things, but failed to use those same facts to find John Doe responsible for sexual assault.

   b.    The Panel questioned Jane Doe more, used factually incorrect statements to confuse her, and used any inconsistencies to attack her credibility. On the other hand, the Panel questioned John Doe much less, did not use factually incorrect statements and asked no questions about his inconsistencies and did not rely on those inconsistencies to find him not credible.

   c.    The Panel failed to properly understand trauma and assess Jane Doe's statements as consistent with those of a victim of sexual assault.

183.    The Panel interpreted facts in favor of supporting John Doe's version when there were equally if not more plausible interpretations that supported Plaintiff's version.  For example, Tiscione described at the Appeal Hearing that he relied on the fact that the door was locked when they were having sex to find that Plaintiff tried to

'isolate' John Doe as support for his claim that she sexually assaulted him, but he did not consider that the dorm room doors lock automatically for school and student safety when closed.

184.    The University administration never sanctioned John Doe for a violation of the school's weapons and ammunition prohibition within the Handbook, which would have resulted in expulsion as Kitsura said would happen.   Instead, Tiscione likened this failure to sanction John Doe for a  weapons charge to amnesty from alcohol charges when alcohol is raised in a sexual misconduct hearing,   Yet, there is a clear policy provision in the Handbook setting forth that alcohol violations are not pursued in sexual misconduct cases; yet there is no express provision for amnesty for possession of weapons. Tiscione favored John Doe and made up an amnesty provision to protect John Doe from being expelled.

185.    Plaintiff stated that the knife was relevant to show intent about violence and possible use of the knife (since it had been opened) and that it was left in the room as a warning to her not to report him because he had a knife and it was a threat. Tiscione unilaterally determined that the knife was not relevant to the sexual misconduct charge but asked no questions of John Doe about why he had the knife, why he brought it to the Plaintiff's room, why he left it with the blade open that night to obtain any information to determine whether the fact that John Doe had the knife when he had sex with Plaintiff was relevant to the question of whether he sexually assaulted her.

186.    The Panel imposed sanctions were grossly disproportional and biased in favor of John Doe. The Panel imposed the same sanction on both parties even though Jane Doe did nothing except to straddle John Doe when he put her on him and held there by her hips, lie under John Doe while he penetrated her digitally and with his penis and lied there while he choked her and called her vulgar names based on undisputed and accepted facts; while Jon Doe based on undisputed facts held her on him, forcefully put her under him, thrust his fingers into her vagina and caused bleeding, choked her and pinned her arms down and penetrated her all causing laceration, and bruises, and they held that she did not consent.  These are very different facts and the Panel is required to look at mitigating and aggravating factors and impose sanctions in accordance with those. Jane Doe was physically incapable of harming John Doe and had no violations of the No Contact Order (NCO) while John Doe did. The Panel in contravention of the facts expressly said the suspension and probation was to keep Jane Doe from harming John Doe.

**The Flawed Appeal Process**

187.    The hearing Determination letter also informed Plaintiff that both she and John Doe had the ability to appeal the decision, by filing a written appeal within five business days.

188.   On June 4, 2019, Plaintiff submitted an appeal on the decision and sanctions imposed and raised the problematic issues with the investigation and the hearing.

189.   In her appeal, Plaintiff argued that her rights to a fair investigation and hearing were violated, that the findings were inconsistent with the facts presented, and that the sanctions imposed were grossly disproportionate to the findings of responsibility.

190.   After submitting her appeal, Plaintiff received a letter from Dr. Christina Spearman, stating that Dr. Spearman had reviewed Plaintiff's appeal request, and would only allow her appeal to proceed on the allegations that her rights to a fair hearing were violated on the narrow ground that the questions she submitted were screened and reduced, and on the grounds that the sanctions imposed were grossly disproportionate to the finds of responsibility.  All of the other complaints of Jane Doe were improperly denied.

191.   John Doe also appealed the sanction imposed on Plaintiff, arguing that the sanctions imposed were insufficient and that Plaintiff should be suspended until after John Doe graduated.

192.   John Doe also appealed the conclusion that he was responsible for sexual verbal abuse and sexual assault, asserting that any harm he caused to Plaintiff could only have occurred in self-defense, despite still maintaining that he had no recollection of the events.

193.    By a letter dated June 20, 2019, Plaintiff requested that Dr. Spearman reconsider and allow her to appeal on all grounds raised.

194.    By an email dated June 24, 2019, Dr. Spearman refused to reconsider her decision.

195.    The appeal hearing for both appeals took place on June 28, 2019.  The Appeal Hearing Panel included Kate Grubb Clark, Program Director External Affairs and Community Relations (Vice President, Special Assistant to the President), Graham McAleer, Professor of Philosophy, and Chair, Michael Puma, Co-Director Messina.

196.    The Appeals Board's decision was a rubber stamp of the Hearing Panel's determination and did not address or cure any of the deficiencies set forth above. The Appeals Board's focus was very narrow and excluded valid grounds for appeal raised by Jane Doe.  None of Plaintiff's assertions that the investigation and initial Hearing were flawed or that inappropriate actions had influenced her case were acted upon by the Christine Spearman (Dean of Students), Kurita Katsura, or the Hearing Panel. Nothing was changed in the outcome or the punishment.  The Appeals Hearing was a sham and was in concert with the coordinated behavior of David Tiscione (Director or Student Conduct), Dr. Spearman (Dean of Student), and Kurita Katsura (Title IX Coordinator) to find the Plaintiff responsible and continue to have biased proceedings in favor of John Doe.

197.    In a letter, dated July 12, 2019, Michal Puma informed Plaintiff that the Appeal Board had denied both Plaintiff's appeal and John Doe's appeal, concluding

DocuSign Envelope ID: 11863794-6B46-456E-8D3C-1B82A0C03873

that both parties received a fair hearing and sanctions proportionate to the offenses found in the original hearing.

198.   This letter informed Plaintiff that the decision against her was final and that she had no further remedy.

199.   During the investigative phase, prior to the initial hearing, Plaintiff was offered counseling by the Title IX attorney, and assured that her privacy would be protected.  However, when Plaintiff later sought help from the school psychiatrist for anxiety and fear as a result of the sexual assault by John Doe, the school psychiatrist stated to Plaintiff that it was her understanding that Plaintiff was responsible for the assault and not John Doe. Plaintiff also reported this fact to the Dean of Students during the Appeals process. The Dean of Students did not investigate this or try to determine if anyone from the Dean's Office, Student Conduct Office, or other school official had talked with the psychiatrist about this case, even though it clearly violated Plaintiff's right to privacy and may indicate additional violations of her rights by one or more of the parties in an attempt to influence the investigation, hearings, decisions, and sanctions in this case.

200.   All of the proceedings, deliberations, communications, and decisions in this case were finalized in close consult with the Kurita Kitsura, the Title IX Coordinator.  Individually, and in total, these actions violated Plaintiff's right to an unbiased, fair, thorough investigation, Hearing and Appeals Board hearing.

## COUNT I
## Violation of Title IX

201.   Plaintiff repeats and realleges paragraphs 1 through 200 as if fully set forth herein.

202.   Plaintiff sustained harassment because of her sex that was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational opportunities.

203.   Plaintiff presented particular facts that are sufficient to cast more than articulable doubt on the accuracy of the outcome of the disciplinary proceeding administered by the University.

204.   The errors and irregularities in Defendant's evaluation of John Doe's consent were motivated by gender bias against Plaintiff and bias in favor of John Doe because Defendant wished to protect the University from Title IX compliance issues.

205.   Every step of the procedure used by Defendant against Plaintiff was gender-biased, including the investigation, initial hearing, and appeal.  The actions of the investigator and the investigative report she prepared were colored with gender-bias against Plaintiff and had a substantial impact on the Hearing Panel's determination. David Tiscione displayed numerous instances of gender-bias against Plaintiff in order to find Plaintiff guilty of the accused violations.  Dr. Spearman, Dean of Students, did not follow up and investigate the Plaintiff's contention that members of the Staff were biased in their actions in this matter. Additionally, there were numerous other

procedural flaws that resulted in a gender-biased outcome against Plaintiff.  This list includes the following actions by Defendant:

a.  An initial attempt to discourage the submission of a complaint by the plaintiff from the Loyola's Title IX Deputy Kitsura Kurita who stated to the plaintiff that this was unusual when the plaintiff expressed her intention to file her sexual assault charge.  In fact, Kitsura's tone, body language, and actual wording was so significant, the plaintiff required legal assistance to ensure her complaint would not be dismissed; which, directly violates Loyola's community standards that "encourages all members of the community to report sexual misconduct"

b.  Failure to fully interview all witnesses, ask appropriate relevant questions, and present all relevant evidence and witness statements in the investigative report.

c.  No opportunity for Plaintiff to question witnesses regarding the allegations.

d.  Failure of investigation to take into consideration John Doe's state of mind in making the allegations and whether they were instigated by his regret and/or friends' retaliatory urging to report or in order to avoid consequences of underage drinking.

e.  Failure to conduct an unbiased investigation as shown by the exclusion of multiple items of evidence supporting the plaintiff's assertion that

she was the victim including exclusion of student testimony that the plaintiff was the victim, failure to ensure that the plaintiff's corrections were included in her response rather than as an attachment at the end, and failure to collect and present key forensic evidence in the investigation report summary.

        f.      Failure to respond to Plaintiff's privacy concerns about the fact that someone had told the psychiatrist, Dina Sokal, she was the responsible party before the hearing.

        g.      Failure to investigate collaboration of witnesses during the investigative process—even as the University issued a no contact order in such a way that denied Plaintiff an opportunity to reach out to relevant student witnesses.

        h.      Failure to consider Plaintiff's account of the sexual encounter or consider multiple items of physical evidence before determining that John Doe was not able to consent to sex.

        i.      Failure to protect the plaintiff during the timeframe leading to the hearing by not expelling John Doe for bringing a weapon on campus, by not expelling John Doe for violation of the no-contact order by entering Jane Doe's dorm after filing of her complaint, and by not expelling John Doe for subsequent stalking of the plaintiff.  The failure to expel John Doe for violating the no-contact order and for stalking the plaintiff is especially alarming given the previous weapons violation.

j.      Allowing the Panel to make credibility determinations without hearing from numerous key witnesses on whose statements in the investigative report the Panel relied.

k.      Unfairly restricting the scope of Plaintiff's appeal, thereby pre-empting any review of whether Plaintiff had been given adequate due process under Title IX during the investigative and hearing process.

l.      Failure of the appeals board to act upon new evidence brought to light by testimony of another student who stated that "the plaintiff was the victim" and that his original statement was omitted from the investigative report; and, failure of the board to act upon the statement by John Doe that he did and would continue to lie – either of which is sufficient to cast substantial doubt on the original investigation and the initial Hearing panel decision.

206.    When all of the forementioned facts of gender bias against the plaintiff are taken into consideration, a systemic pattern of gender bias by Loyola against the plaintiff in order to protect a male student is evident.  This gender bias started from the onset with the plaintiff's discussion with staff who dissuaded her from submitting a sexual assault complaint and continued through the investigation, hearing, and appeals process.

207.    On information and belief, the erroneous outcome of the investigation, hearing, and appeal regarding the charges against her and against John Doe was the result by a concerted gender-bias against Jane Doe because she was female and in favor

of John Doe because he was male in cases involving allegations of sexual assault. This bias is reflected in the patterns of decision making by Defendant throughout the entire process and resulted in a biased and unfair outcome against Plaintiff that has had a prolonged and lasting negative impact on her life.

## COUNT II
## TITLE IX (ERRONEOUS OUTCOME)

208.    Plaintiff repeats and realleges paragraphs 1 through 207 as if fully set forth herein.

209.    Plaintiff sustained harassment because of her sex that was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational opportunities.

210.    Defendant conducted an inadequate, biased and unfair Investigation, Hearing and Appeal, which resulted in the incorrect determination that Plaintiff was responsible for the charges against her.

211.    Defendant conducted an inadequate, biased and unfair Investigation, Hearing and Appeal, which resulted in the incorrect determination that John Doe was not responsible for all the charges against him.

212.    The Hearing was not the result of a bona fide, good faith investigation, but instead resulted from and relied primarily on the investigator's biased, unfair and inadequate report.

213.    The Appeal was not the result of a bona fide, good faith review of the

record, but instead resulted from and relied primarily on the investigator's biased and inadequate report and the biased Hearing Committee and Hearing.

214.   In their actions with respect to the Investigation, the Hearing, and the Appeal, the Defendant was motivated by bias with respect to sex.

215.   The Defendant's investigation, Hearing, finding of Responsibility after the Hearing on charges against Plaintiff, and the affirmation of the Hearing Committee's findings on Appeal was biased against her based on her gender.

216.   The Defendant's investigation, Hearing, findings of Non Responsibility after the Hearing on charges against John Doe, and the affirmation of the Hearing Committee's findings on Appeal was biased in favor of him based on his gender.

217.   Had Jane Doe been male and had John Doe been female, Loyola would not have favored her like it favored John Doe as both a complainant and as a respondent, and there is little doubt that Jane Doe would been found not responsible for any charges of sexual misconduct or assault, that John Doe would have been found responsible for all charges,  and that Jane Doe's Appeal would not have been denied.

218.   The above facts alleged are sufficient to cast more than articulable doubt on the accuracy of the outcome of the disciplinary proceeding administered by the University.

219.   Plaintiff, based solely on her gender, suffered an erroneous outcome of the Investigation, Hearing and Appeal, which substantially limited her ability to

participate in and benefit from Loyola's educational program.   This unlawful discrimination by Loyola in violation of Title IX proximately caused Jane Doe to sustain substantial injury, damage, and loss, including, but not limited to, mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

**COUNT III**
**TITLE IX (SELECTIVE ENFORCEMENT)**

220.   Plaintiff repeats and realleges paragraphs 1 through 219 as if fully set forth herein.

221.   Plaintiff sustained harassment because of her sex that was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational opportunities.

222.   Defendants treated John Doe more favorably than Plaintiff, who was similarly situated, in its disciplinary investigation, its Hearing and its Appeal related to their statuses as complainants.  In its actions, the Defendant was motivated by bias with respect to sex.  Defendant's investigation, Hearing, finding of Responsibility at the Hearing on the charges, and the affirmation of the Hearing Committee's findings on Appeal was based on her gender.

223.   Defendant treated John Doe more favorably than Plaintiff, who was similarly situated, in its disciplinary investigation, its Hearing and its Appeal related

to their statuses as respondents. In its actions, the Defendant was motivated by bias with respect to sex.  Defendant's investigation, Hearing, finding of Responsibility at the Hearing on the charges, and the affirmation of the Hearing Committee's findings on Appeal was based on her gender.

224.    Had Jane Doe been male and had John Doe been female, Loyola would not have favored her like it favored John Doe as both a complainant and as a respondent, and there is little doubt that Jane Doe would been found not responsible for any charges of sexual misconduct or assault, that John Doe would have been found responsible for all charges,  and that Jane Doe's Appeal would not have been denied.

225.    Plaintiff, based solely on her gender, suffered selective enforcement of the disciplinary process, which substantially limited her ability to participate in and benefit from Loyola's educational program.  This unlawful discrimination by Loyola in violation of Title IX proximately caused Jane Doe to sustain substantial injury, damage, and loss, including, but not limited to, mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects

## COUNT IV
### Breach of Contract

226.    Plaintiff repeats and realleges paragraphs 1 through 225 as if fully set forth herein.

227.    Jane Doe applied to and enrolled as a student at Loyola and paid all required tuition, fees, and expenses.

228.    Jane Doe's application to and enrollment as a student in Loyola was done in reliance on Loyola's representations, and with the reasonable expectation, that Loyola would implement and enforce the provisions and policies set forth in its official publications, including its Handbook and its Title IX Policy, as well as all supporting and explanatory documents produced, published, and/or disseminated by Loyola.

229.    An express contract or, alternatively, a contract implied in law or in fact was formed between Jane Doe and Loyola.

230.    Plaintiff entered into the contract with Defendant with the belief and understanding that Defendant would fulfill its obligations under the Community Standards Handbook.

231.    Plaintiff entered into the contract with Defendant with the belief and understanding that Defendant would allow her to continue as a student at the University and graduate from the University if she complied with the terms of the Community Standards Handbook.

232.    Loyola breached its contract with Jane Doe including but not limited to one or more of the following ways:

a)      Loyola failed to investigate John Doe's potential violations of Loyola  Publications, including, but not limited to, the weapons charges.

b)      Loyola failed to take action either in response to John Doe's breach of his NCO, or in response to Plaintiff's complaint about the breach of

confidentiality regarding the investigation.

c)    Loyola failed to investigate the charges against Jane Doe in a fair, impartial, and equitable manner.

d)    Loyola failed to investigate the charges against John Doe in a fair, impartial, and equitable manner.

e)    Loyola conducted an inadequate and incomplete investigation of the charges against Jane Doe.

f)    Loyola conducted an inadequate and incomplete investigation of the charges against John Doe.

g)    Loyola conducted a biased investigation, hearing and Appeal of the charges against Jane Doe and John Doe.

h)    Loyola conducted a biased investigation hearing and Appeal of the charges against Jane Doe and John Doe due to their gender and applied sex based stereotypes and generalizations.

i)    Loyola failed to comply with Title IX;

j)    Loyola failed to provide an environment free from gender-based discrimination and harassment and its promise to address gender-based misconduct;

k)    Loyola failed to include relevant exculpatory evidence for Jane Doe in the investigative report and hearing;

l)    Loyola failed to show by a preponderance of the evidence that plaintiff was responsible for her charges;

m)    Loyola failed to correctly analyze the evidence using the preponderance of the evidence failing to find John Doe responsible for sexual assault and physical contact;

n)    Loyola failed to make accurate credibility determinations;

o)      Loyola shifted the burden to Plaintiff to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred.

p)      Loyola failed to appoint a person free of actual or reasonably perceived conflicts of interest and biases for or against any party to lead the investigation on behalf of the school and failed to ensure that institutional interests do not interfere with the impartiality of the investigation.

q)      Loyola failed to interview key witnesses for Plaintiff's in the investigation and in the hearing;

r)      Loyola failed to treat plaintiff in the same manner and provide the same benefits as they did the John Doe because she was female and he was male;

s)      Upon information and belief, Kitsura, the investigator, the Panel, Tiscione, and the Appeal Board members Hearing Committee members were not properly trained in Title IX matters;

t)      Upon information and belief, there was no person trained in understanding the effect of trauma in sexual assault, how to conduct an investigation, how to make credibility assessments, how to apply the preponderance of the evidence standard, and diagnoses including anxiety, depression and PTSD, to assist the Panel in understanding how these diagnoses and symptoms could explain the underlying conduct at issue and affect credibility determinations based on Jane Doe's behavior in the interviews and Hearing;

u)      Loyola failed to appoint a trained investigator to "analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case;

v)      Loyola treated John Doe with dignity, respect, and sensitivity and failed to treat Jane Doe the same.

w)      The Hearing Committee relied primarily on the biased and inadequate investigative Report to make its findings;

x)      Jane Doe was never given a meaningful opportunity to present her defense to the Hearing Committee and had she, she would not have been found responsible, including asking cross examination questions of John Doe;

y)      The Panel used the wrong definition of consent when finding John Doe not responsible for sexual assault;

z)      The Panel used the wrong definition of incapacitation when finding Jane Doe responsible for sexual assault;

aa)      Loyola forbade Jane Doe from discussing the matter with any students; and

bb)      The sanctions were not proportionate to the violation and did not consider the impact of separating Jane Doe from her education.

233.    Jane Doe has performed all conditions required of her under the terms of the Loyola Publications.

234.    As a result of Loyola's breach of the Loyola Publications as set forth above, Jane Doe has sustained substantial monetary losses and other significant damages, including severe mental distress and anguish, loss of educational opportunities, loss of academic achievement, loss of employment opportunities, and loss of reputation, economic injuries, and other direct and consequential damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

A.      Enter an order declaring that Loyola has engaged in discrimination on the basis of sex in violation of Title IX and the regulations promulgated thereunder;

B.      Issue a permanent injunction directing Loyola to remove any findings of responsibility from Jane Doe's university student disciplinary record regarding John Doe's complaints; directing Defendant to expunge the entire disciplinary proceeding from its records; directing  Defendant to refrain from referencing Plaintiff's disciplinary proceeding in the event of any third-party inquiry; declaring that upon any third-party inquiry, Plaintiff may reply in the negative as to any question as to whether she has been accused of sexual misconduct or as to any similar question; and restraining Loyola from discriminating against its students on the basis of sex in violation of Title IX and the regulations promulgated thereunder;

C.      Maintain jurisdiction over this action to monitor Loyola's compliance with the Court's orders;

D.      Award plaintiff compensatory damages, and other monetary relief as permitted by law in an amount to be determined at trial, but not less than $75,000.00 for mental anguish, loss of trust, severe emotional distress, serious mental injury, injury to reputation, past and future economic loss, deprivations of due process, loss of educational opportunities, loss of future career prospects, and other injuries proximately caused by the wrongful conduct of defendant;

E.   Award plaintiff reasonable attorneys' fees and expenses pursuant to 42
U.S.C. §1988 or pursuant to any other statute or common law doctrine
providing for the award of attorney's fees, disbursements, and/or costs;

F.   Award prejudgment interest and

G.   Order such other and further relief as the Court deems appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY AS TO ALL ISSUES TRIABLE
BY A JURY.**

Dated: 9/28/2021

DocuSigned by:

*Jane Doe*

B0B4AAD18063461...

Jane Doe

Dated: 9/29/2021                    **LAW OFFICE OF RICHARD P. ARNOLD**

DocuSigned by:

*Richard P. Arnold*

1DE98A8CD31F4E0...

Richard P. Arnold, Bar No.: 25147
Attorney for Plaintiff
39 West Lexington Street
Baltimore, MD 21201
Telephone: (301) 613-5550
richardparnold@hotmail.com